828 F.2d 19
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Thomas ANGELO, et al., Plaintiffs-Appellants,
v.
The KROGER COMPANY, Local 407 of the International
Brotherhood of Teamsters, Chauffeurs, and
Warehousemen, Defendants-Appellees.
 No. 86-3912
 United States Court of Appeals, Sixth Circuit.
 September 3, 1987.
 
 Before CORNELIA G. KENNEDY, MILBURN and ALAN E. NORRIS, Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 Plaintiffs, fifty-one former employees of defendant Kroger Company's Cleveland Distribution Center (primarily as drivers), and at all relevant times members of defendant Local 407, International Brotherhood of Teamsters, Chauffeurs, and Warehousemen, appeal the district court's grant of summary judgment in favor of defendants in this hybrid breach of contract/breach of the duty of fair representation action brought under section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185. Plaintiffs argue the district court erred in finding defendants entitled to summary judgment on the issues of (1) whether some of plaintiffs' claims are barred by the statute of limitations; (2) whether Kroger breached the collective bargaining agreement; and (3) whether the union breached its duty of fair representation. Plaintiffs further argue the district court erred in finding their response to defendants' motions for summary judgment insufficiently supported by facts in light of various court orders which plaintiffs assert prevented them from engaging in adequate discovery. For the reasons that follow, we affirm, as time-barred, the district court's dismissal of plaintiffs' claims arising out of the grievances decided in June, 1984; however, because defendants failed to satisfy their burden of demonstrating that they were entitled to judgment on plaintiffs' breach of contract claims arising out of the grievances decided in December, 1984, and because disputed issues of material fact remain as to whether the union breached its duty of fair representation in handling those grievances, we reverse and remand for further proceedings.
 
 I.
 A. Procedural History
 
 2
 Plaintiffs filed this action on June 11, 1985. The relevant allegations in plaintiffs' complaint that Kroger breached the collective bargaining agreement are as follows:
 
 
 3
 Beginning in late 1983, and continuing through 1984, the Defendant Kroger Company systematically closed out certain of its retail operations in Northeastern Ohio and Western Pennsylvania. Work previously performed by the Plaintiffs was subcontracted to non-Kroger common carriers, and reallocated to Kroger drivers from another division, who assumed responsibility for the remaining Kroger retail operations within this division. Eventually, Defendant Kroger announced that the Cleveland Distribution Center would be closed and all the drivers, including the Plaintiffs, placed on indefinite lay-off.
 
 
 4
 Contrary to the provisions of the Agreement, Defendant Kroger refused to offer employment to the Plaintiffs; unlawfully subcontracted work properly belonging to the Plaintiffs to other companies and drivers; and refused to require successor carriers to employ the Plaintiffs.
 
 
 5
 Amended Complaint[1] ps 9, 10. The operative allegations in plaintiffs' complaint that the union breached its duty of fair representation are as follows:
 
 
 6
 Following their denial of employment rights by Defendant Kroger, Plaintiffs caused to be filed several grievances under the procedures established by the Agreement.
 
 
 7
 Local 407 of the IBT conducted an incomplete and cursory investigation of the allegations against Defendant Kroger, failed to properly marshall relevant and culpatory [sic] evidence regarding the circumstances of Defendant Kroger's replacement of the Plaintiffs by other workers from Columbus and Northeastern Ohio, and in general failed to appropriately present the case to the hearing panel.
 
 
 8
 Amended Complaint ps 13, 14.
 
 
 9
 On July 25, 1985, Kroger filed its answer, and on July 29, 1985, the union filed its answer. In addition to denying all allegations of wrongdoing, defendants asserted as an affirmative defense that plaintiffs' claims are barred by the statute of limitations. Defendants' motions for summary judgment were filed on August 19, 1985.
 
 
 10
 On August 29, 1985, plaintiffs moved that they be allowed an extension of ninety days to respond to defendants' summary judgment motions 'in order to permit Plaintiffs to complete discovery directed at the issues addressed in Defendants' motions.' Joint Appendix at 159. In the alternative, plaintiffs requested a thirty-day extension 'to permit counsel to have an adequate opportunity to do the necessary research and writing to respond to Defendants' motions as best as possible without discovery.' Joint Appendix at 160. On September 4, 1985, the district court entered an order giving plaintiffs until September 30, 1985, to respond. On September 30, 1985, plaintiffs requested an additional fourteen days 'to respond to Defendants' motions as best as possible without discovery.' Joint Appendix at 172. On October 1, 1985, the district court granted plaintiffs' motion and on October 15, 1985, plaintiffs filed their response to the summary judgment motions. Therein, plaintiffs argued that a decision on the motions for summary judgment should be refused or a continuance granted pursuant to Rule 56(f), Federal Rules of Civil Procedure. On August 22, 1986, the district court rendered its Memorandum of Opinion granting defendants' motions for summary judgment. On September 8, 1986, plaintiffs filed a motion for reconsideration, which was denied on September 18, 1986.
 
 B. Facts
 
 11
 This action arose out of the closing of Kroger's Cleveland Distribution Center ('CDC') in Solon, Ohio, on November 7, 1984. Prior to 1984, the CDC serviced Krogeroperated supermarkets in the northeastern Ohio-western Pennsylvania area. In addition to delivering goods from the CDC, CDC drivers delivered baked goods from Kroger's Solon, Ohio, bakery and dairy products from Kroger's Tamarack Dairy in Newark, Ohio. As a result of a strike by the Retail Clerks Union, Kroger closed its Pittsburgh supermarkets in early 1984, which in turn resulted in the loss of 50 per cent to 55 per cent of the volume of deliveries by the CDC. The employment of union drivers dropped from 118 to 60-65.
 
 
 12
 On February 8, 1984, the CDC ceased deliveries from the Tamarack Dairy, which awarded the work to Distribution Systems, Inc. ('DSI') of Memphis, Tennessee, on the basis of a bid CDC could not meet. DSI's employees were represented by the Teamsters, but not by Local 407.
 
 
 13
 Beginning on April 1, 1984, deliveries from the Solon bakery were made using drivers supplied by Transportation Unlimited ('TU'), of Cleveland, Ohio. These deliveries to the Charlie Bros. chain stores in Pittsburgh and the Bonnie Bell stores in Detroit were accomplished with Kroger trucks (idled by the Pittsburgh closings) by replacing the trailers' Kroger identification with the bakery's 'Country Oven' logo. TU was employed to make the deliveries pursuant to an oral service agreement with the CDC. The CDC chose to use TU because its labor costs were $3 an hour lower than Local 407's.
 
 
 14
 On April 29, 1984, the CDC ceased using TU drivers as a result of the failure to reach agreement on a written contract. The Detroit Bonnie Bell deliveries were returned to Local 407 drivers. However, the Pittsburgh Charlie Bros. deliveries were awarded to drivers supplied by Commercial Labor Services, Inc. ('CLS') of North Royalton, Ohio, which for the preceding five years had supplied CDC with casual drivers as needed. CLS drivers were represented by the Teamsters, but not Local 407.
 
 
 15
 Local 407 filed grievances regarding the use of TU drivers, as well as an unfair labor practice charge with the National Labor Relations Board. A grievance (No. 84-94) was also filed regarding the transfer of the Tamarack Dairy deliveries from the CDC to DSI. On June 12 and 13, 1984, the grievances were heard in Chicago, Illinois, pursuant to step 3 of the grievance procedure by a board comprised of Kroger and union representatives. All the grievances were clearly denied with the exception of the grievance pertaining to the transfer of the Tamarack Dairy deliveries from the CDC to DSI. As to No. 84-94, the decision was as follows: 'If Subcontractor has bonifide [sic] Teamster contract, the grievant [sic] is denied, if not the test set out in Article 25.1 applys [sic].' Joint Appendix at 86. On June 25, 1984, the unfair labor practice charge was withdrawn by the union with the approval of the Regional Director.
 
 
 16
 On May 29, 1984, Kroger informed the union that economic conditions necessitated the closing of eighteen of forty-one supermarkets in the Cleveland area. Kroger further informed the union that it intended to close the CDC and service its remaining northern Ohio supermarkets from its Columbus Distribution Center. The parties negotiated over the impact of the closing, with the result being that Kroger agreed that Local 407 members would receive two years' preferential hiring rights at the Columbus Center, rather than the one year provided in the collective bargaining agreement.
 
 
 17
 Throughout the summer of 1984, Kroger phased out operations at the CDC. On July 8, 1984, the CDC ceased deliveries from the Solon bakery to Charlie Bros. in Pittsburgh. These deliveries were awarded by the Solon bakery to Ryder Distribution Systems. The record contains no evidence reflecting that a grievance was filed regarding this matter.
 
 
 18
 On July 15, 1984, the delivery of produce, eggs, and perishables was transferred from the CDC to the Columbus Distribution Center. In response, Local 407 asked for and received a seniority list of the Columbus drivers. The union also filed a unit clarification petition with the NLRB which was withdrawn on July 18, 1984.
 
 
 19
 On September 15, 1984, the CDC ceased all remaining shipments, except bakery. On October 13, 1984, deliveries from the Solon bakery were discontinued, the bakery awarding the deliveries to Leaseway Transportation. Leaseway drivers are represented by the Teamsters, but not Local 407.
 
 
 20
 The union filed a class grievance asserting the right to 'follow the work' transferred to the Columbus division, as well as a class grievance asserting the right to follow the bakery work transferred to Leaseway. These grievances were heard at step 3 in Chicago on December 11 and 12, 1984. By letter dated December 18, 1984, Local 407 was informed that the grievances were denied.
 
 II.
 A. Statute of Limitations
 
 21
 The district court held that plaintiffs' claims grounded in the grievances decided in June, 1984, which concerned plaintiffs' allegations that Kroger breached the collective bargaining agreement by 'subcontract[ing] work properly belonging to the Plaintiffs to other companies and drivers' (Amended Complaint p10), are barred by the six-month statute of limitations established in DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151 (1983).[2] The district court noted that on June 12, 1984, the grievances against Kroger for wrongful subcontracting were denied at the third step of the grievance procedure. The court further noted that a third-step denial is final and binding (see Joint Appendix at 35-36), 'but even if it were not, Local 407 had thirty days in which to take the grievance to arbitration. Thus, by July 12, 1984, the plaintiffs were on notice that Local 407 had not and could not take further action on their behalf with respect to those grievances.' Joint Appendix at 255 [citation omitted]. Because July 12, 1984, is more than six months prior to the filing of the complaint on June 11, 1985, the district court held these claims to be time-barred.
 
 
 22
 Plaintiffs first argue that although the union's business representative, Art Majewski, deposed that the subcontracting grievances were denied on June 12, 1984, the underlying evidence submitted by defendants, upon which Majewski's affidavit is based, supports a contrary conclusion. In particular, plaintiffs argue that the letter informing Majewski of the grievance results indicates that No. 84-94 (the Tamarack Dairy grievance[3]) was not denied. The letter states: 'If Subcontractor has bonifide [sic] Teamster contract, the grievant [sic] is denied, if not the test set out in Article 25.1 applys [sic].' Joint Appendix at 86.
 
 
 23
 However, assuming arguendo that No. 84-94 was not finally decided on June 12, 1984, plaintiffs nonetheless fail to refute the district court's observation that, by operation of the collective bargaining agreement, the union was powerless to take further action after July 12, 1984, thirty days after the step 3 hearing. See Joint Appendix at 36, Sec. 8.3. Accordingly, plaintiffs' cause of action regarding No. 84-94 accrued no later than July 12, 1984. See, e.g., Shapiro v. Cook United, Inc., 762 F.2d 49, 51 (6th Cir. 1985) (per curiam).
 
 
 24
 Plaintiffs next note that no grievances were filed regarding the Commercial Labor Services and Ryder Distribution Systems subcontracts. Plaintiffs have not, however, alleged that the union breached its duty of fair representation by not filing grievances regarding these matters. Rather, plaintiffs only alleged that the union 'in general failed to appropriately present the case to the hearing panel.' Amended Complaint p14. Accordingly, plaintiffs failed to exhaust their contractual remedies regarding these claims. See Vaca v. Sipes, 386 U.S. 171, 184 (1967).
 
 
 25
 Plaintiffs next argue that a factual dispute is present as to whether by July 12, 1984, plaintiffs knew or should have known that a final decision had been rendered on the grievances heard in June, 1984. See, e.g., Shapiro, 762 F.2d at 51 (statute of limitations 'begins to run when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation.'). Plaintiffs note that Ralph McAdoo, a union steward at the CDC, deposed that he '[did] not remember being informed of the outcome' and that he did 'not believe that the membership was informed.' See Joint Appendix at 213. McAdoo further deposed that he had 'no recollection of the posting of the June decision or any subsequent decision, or any announcement, by word of mouth or otherwise, of the result.' Joint Appendix at 214. Plaintiffs further note that Exhibit A to the Paula Race affidavit (Joint Appendix at 125-26) indicates that many of the plaintiffs were on layoff at the time, which plaintiffs assert further supports the conclusion that plaintiffs were unaware of the grievance results. Finally, plaintiffs observe that there is no evidence that plaintiffs were in attendance at the Chicago hearings or that defendants made any attempt to notify plaintiffs of the results of the hearing.
 
 
 26
 Plaintiffs' evidence is sufficient to create a factual dispute as to whether they actually knew the results of the grievances. However, we believe the record supports a finding that, as a matter of law, plaintiffs should have known the results sometime prior to December 11, 1984 (six months prior to the filing of the complaint).
 
 
 27
 In Metz v. Tootsie Roll Industries, Inc., 715 F.2d 299 (7th Cir. 1983), cert. denied, 464 U.S. 1070 (1984), the employee argued that the statute of limitations had not yet begun to run because neither her employer nor her union had informed her of the outcome of her request for the filing of a grievance. The Metz court first noted that the collective bargaining agreement provided that once a grievance had been filed, the grievance procedures were to be exhausted within twenty-three days. Id. at 304. The court accordingly concluded that the plaintiff should have known that the time to compel arbitration had arrived prior to six months preceding the time her federal action was brought. This analysis cannot be applied in the present case, however, because the agreement between Kroger and the union does not provide that the step 3 hearing must be held within any particular period of time after the grievance is filed. See Joint Appendix at 35.
 
 
 28
 However, the Metz court also noted that seven months of union inactivity preceded the six-month statutory period. The court concluded that '[a]t some point prior to the six month statutory period, the appellant should have realized that the Union was taking no action on her behalf. The appellant cannot be allowed to sit back and claim a lack of notice in light of circumstances such as these.' 715 F.2d at 304.
 
 
 29
 In the present case, the subcontracting grievances were filed on February 13 and April 5 of 1984. See Joint Appendix at 25-26. The six-month statutory period began on December 11, 1984. Thus, some eight months passed between the filing of the grievances and the beginning of the six-month statutory period. We agree with the reasoning in Metz that plaintiffs 'cannot be allowed to sit back and claim a lack of notice in light of circumstances such as these.' 715 F.2d at 304. A reasonably diligent claimant should have discovered the results of the grievances and the basis for any claim that the union breached its duty of fair representation in handling the grievances prior to the statutory period. See id.; Shapiro, 762 F.2d at 51.
 
 
 30
 As the Seventh Circuit observed, '[t]his result is consistent with the strong federal policy favoring the prompt resolution of labor disputes.' 715 F.2d at 304. If some requirement of diligence by the employee in keeping himself apprised of the progress of his grievance is not imposed, the statute of limitations would never begin to run if the collective bargaining agreement contains no time limitations between the filing of the grievances and a final decision and if the employer and the union cannot prove actual notification. See Dowty v. Pioneer Rural Elec. Coop., Inc., 770 F.2d 52, 57 (6th Cir.) (per curiam), cert. denied, 106 S. Ct. 572 (1985). Without attempting to delineate the inner limits, we believe that seven months as in Metz (and eight months as in the present case) is too lengthy a period for an employee to take no action to attempt to discover the progress of his grievance.
 
 
 31
 Plaintiffs next argue that the district court 'should have tolled the statute of limitations until such time as the Kroger's systematic subversion of the contract became apparent, after the December 11, 1984 grievance hearing and not until the Plaintiffs became aware of the decision and the union's misconduct, which could not have occurred until after December 13, 1984.' Brief at 30 (emphasis in original). Plaintiffs are confusing the issue. The only question presently being addressed is whether plaintiffs' claims arising from the subcontracting grievances are time-barred. Plaintiffs' assertion that Kroger systematically subverted the contract is a distinct allegation from the grievances decided in June, 1984.
 
 
 32
 Moreover, contrary to plaintiffs' assertion, we do not read plaintiffs' complaint as containing any allegation that Kroger systematically subverted the contract, which would arguably be a violation of the provision in Article 25.1 that Kroger will not 'subcontract or transfer work for the purpose of circumventing the terms and provisions of this Agreement.' Joint Appendix at 42. Furthermore, plaintiffs never filed a grievance alleging that Kroger systematically subverted the contract and accordingly have failed to exhaust their contractual remedies. See Vaca v. Sipes, 386 U.S. at 184.
 
 
 33
 Plaintiffs' argument that the statute of limitations should have been tolled because of fraudulent concealment deserves little discussion. Plaintiffs argue that Kroger proceeded 'with a cleverly disguised, piecemeal attack upon the contract' (Brief at 32), and that had Kroger eliminated all of the work at once, plaintiffs would have realized the effects of the subcontracts. However, in May 1984, Kroger informed the union that it intended to close the CDC and negotiations (in which plaintiff McAdoo participated) followed. Accordingly, plaintiffs were in fact aware, long before December 1984, that all the work at the CDC would be eliminated.
 
 
 34
 Finally, plaintiffs argue that by application of the continuing violation rationale set forth in Sevako v. Anchor Motor Freight, Inc., 792 F.2d 570 (6th Cir. 1986), plaintiffs' complaint was timely 'at least with respect to those violations included in the December 11th and 12th grievances.' Brief at 35. It is unnecessary to address this argument, however, because the district court did not find those claims time-barred.[4]
 
 
 35
 In light of our affirmance of the district court's findings as to the statute of limitations, we need not discuss the district court's holding that the undisputed facts demonstrate that Kroger did not violate the collective bargaining agreement through its actions that were the subject of the June, 1984, grievances. Accordingly, we turn to plaintiffs' allegations arising from the December, 1984, grievances.[5]
 
 B. Breach of Contract
 
 36
 In rejecting plaintiffs' claim that Kroger violated section 5.4 of the Agreement,[6] the district court stated:
 
 
 37
 As to the work transferred to [the Columbus Distribution Center], the plaintiffs' contention that Kroger did not permit them to follow their work is without merit. It is uncontroverted that there has been no hiring at [the Columbus Center] since the [CDC] was closed. Because there has been no work for plaintiffs to follow, they have not been denied their preferential hiring rights.
 
 
 38
 Joint Appendix at 254 (footnote omitted).
 
 
 39
 Plaintiffs note that the district court based its finding that there had been no hiring at the Columbus Center since the CDC closed on the affidavit of Paula Race, an assistant personnel manager with Kroger, who stated: 'No drivers have been hired at the Columbus Distribution Center since the Cleveland Distribution Center closed on November 7, 1984.' Joint Appendix at 124. Plaintiffs point out, however, that the record contains evidence that work was transferred to the Columbus Distribution Center prior to the closing of the CDC on November 7, 1984.[7] We are thus left with a situation where there is no evidence one way or the other on a material issue of fact.
 
 
 40
 The Supreme Court recently discussed this problem in Celotex Corp. v. Catrett, 106 S. Ct. 2548 (1986), wherein the Court rejected the position that a party must always support his motion for summary judgment with affidavits:
 
 
 41
 We think that the position taken by the majority of the Court of Appeals is inconsistent with the standard for summary judgment set forth in Rule 56(c) of the Federal Rules of Civil Procedure. Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material face,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.
 
 
 42
 Id. at 2552-53 (footnote omitted; emphasis supplied).
 
 
 43
 In the present case, it is plaintiffs' burden to establish a breach of the contract by Kroger. However, before reaching the question of whether summary judgment was properly entered against plaintiffs due to the complete failure of proof on an issue upon which plaintiffs bear the burden of persuasion, it must first be determined whether Kroger met its 'initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believe[d] demonstrate[d] the absence of a genuine issue of material fact.' Id. at 2553; see also id. at 2558 (Brennan, J., dissenting) ('If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the Court need not consider whether the moving party has met its ultimate burden of persuasion.'); Smith v. Hudson, 600 F.2d 60, 64 (6th Cir.) ('A party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant.'), cert. dismissed, 444 U.S. 986 (1979).
 
 
 44
 Justice Brennan expanded on the moving party's burden of production in a case such as this where the nonmoving party bears the burden of proof at trial:[8]
 
 
 45
 The burden of production imposed by Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment. The manner in which this showing can be made depends upon which party will bear the burden of persuasion on the challenged claim at trial . . ..
 
 
 46
 If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law.
 
 
 47
 Where the moving party adopts this second option and seeks summary judgment on the ground that the nonmoving party--who will bear the burden of persuasion at trial--has no evidence, the mechanics of discharging Rule 56's burden of production are somewhat trickier. Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. Such a 'burden' of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. Rather, as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.
 
 
 48
 Id. at 2557-58 (Brennan, J., dissenting) (citations omitted; emphasis supplied).
 
 
 49
 In our view, defendants failed to satisfy this burden. The Race affidavit attempts to satisfy the first method identified by Justice Brennan as a means for the moving party to satisfy its initial burden of production. However, the affidavit does not speak to the entire period of time during which work assertedly had been transferred to the Columbus Distribution Center. Accordingly, the affidavit does not conclusively negate plaintiffs' claim by establishing that the contract was not breached.
 
 
 50
 Our review of the record convinces us that defendants did not otherwise satisfy their burden. Defendants did not 'review[ ] for the court the admissions, interrogatories and other exchanges between the parties that are in the record' in order 'to establish the inadequacy of documentary evidence.' Id. at 2557. We thus conclude that the district court erred in determining that defendants were entitled to judgment on this breach of contract claim.
 
 
 51
 C. Breach of the Duty of Fair Representation
 
 
 52
 We must next consider whether the district court erred in granting summary judgment on plaintiffs' claim that the union breached its duty of fair representation in handling the grievances alleging that Kroger wrongfully denied plaintiffs their right to 'follow the work' transferred to the Columbus Distribution Center. Such a showing is a necessary element to plaintiffs' section 301 action. See Vaca v. Sipes, 386 U.S. at 184. In reaching its conclusion that the undisputed facts show that the union did not breach its duty, the district court stated:
 
 
 53
 Local 407 processed the grievances but did not seek arbitration. Because the grievances were denied at the third step, Local 407 could not seek arbitration. Moreover, no jobs were available at [the Columbus Center] and thus there was no basis on which to arbitrate the grievances. The court holds that Local 407's conduct was not arbitrary, discriminatory, or in bad faith.
 
 
 54
 Joint Appendix at 256.
 
 
 55
 Plaintiffs correctly argue that the district court misconstrued the nature of their claim against the union because plaintiffs did not allege that the union breached its duty by failing to take the grievances to arbitration. Rather, plaintiffs alleged that:
 
 
 56
 Local 407 of the IBT conducted an incomplete and cursory investigation of the allegations against Defendant Kroger, failed to properly marshall relevant and culpatory [sic] evidence regarding the circumstances of Defendant Kroger's replacement of the Plaintiffs by other workers from Columbus and Northeastern Ohio, and in general failed to appropriately present the case to the hearing panel.
 
 
 57
 Amended Complaint p14.
 
 
 58
 Assuming arguendo that defendants met their burden of production under Rule 56 as to this issue, we believe the record contains 'sufficient evidence favoring [plaintiffs] for a jury to return a verdict' finding that the union breached its duty of fair representation. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986). Plaintiff McAdoo deposed that:
 
 
 59
 The grievances were handled by Dick Sanzo, who is a business agent of Local 407, at that level. Mr. Sanzo was not the business agent for grocery employees; I believe he is a freight business agent. I do not believe he is familiar with the interpretations of the Kroger contract. He did not meet with us to prepare the grievance, and got no briefing on it by Local 407. It is at the third step that all of the grievances were lost. I have heard that he was unable to make the necessary factual and contractual arguments at the hearings on December 11 and 12, 1984.
 
 
 60
 Joint Appendix at 208.
 
 
 61
 Defendants argue that McAdoo's affidavit should be disregarded as containing bald, unsupported allegations insufficient to establish a right to recover under section 301. We disagree. In Poole v. Budd Co., 706 F.2d 181 (6th Cir. 1983), we stated:
 
 
 62
 A breach of this duty occurs 'only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory or in bad faith.' [Vaca v. Sipes, 386 U.S. at 190.] A union's conduct may be sufficiently arbitrary to establish a breach of its duty to fairly represent its members when it handles a grievance in a 'perfunctory' manner, with caprice or without rational explanation. See id. at 194. The employee need not necessarily show bad faith, yet mere negligence or mistaken judgment is insufficient to establish a breach of the union's duty.
 
 
 63
 Id. at 183 (citations omitted; emphasis supplied).
 
 
 64
 As noted, McAdoo deposed (without qualifications such as 'I believed' and 'I have heard') that Sanzo handled the grievance, that Sanzo was not the business agent for the grocery employees, that Sanzo did not meet with Local 407 to prepare for the grievance and that Sanzo received no briefing on the grievance from Local 407. In considering whether union conduct is 'arbitrary and perfunctory,' courts look to 'whether the union has made a full investigation, has given the grievant notice and an opportunity to participate, has mustered colorable arguments and has refuted insubstantial arguments by the employer.' R. Gorman, Labor Law 718 (1976); Hester v. International Union of Operating Eng'rs., 818 F.2d 1537, 1549 (11th Cir. 1987) (per curiam) (Tjoflat, J., concurring in part and dissenting in part); cf. Schultz v. Owens-Illinois, Inc., 696 F.2d 505, 517 (7th Cir. 1982) (suggesting that a union breaches its duty of fair representation when the grievance is processed by an individual who 'fail[s] to act as a diligent advocate for their cause.'). In our view, McAdoo's affidavit, if uncontroverted, would provide sufficient evidence from which a jury might conclude that Local 407 handled the grievances in a perfunctory manner. Accordingly, the district court's grant of summary judgment on plaintiffs' claim that the union breached its duty of fair representation must be REVERSED and this case remanded for further proceedings.[9]
 
 III.
 
 65
 With the exception of plaintiffs' claims arising out of their December, 1984, grievances, the district court's judgment is AFFIRMED in all respects. The district court's grant of summary judgment as to the claims arising out of plaintiffs' December, 1984, grievances is REVERSED, and this cause is REMANDED for further proceedings consistent with this opinion.
 
 
 
 [1]
 On August 23, 1985, the district court granted plaintiffs' motion to amend the complaint to substitute Local 407 for references to International Brotherhood of Teamsters in the factual allegations of the original complaint
 
 
 [2]
 Plaintiffs note that two grievances were not heard until December 11 or 12, 1984. However, the district court did not hold that these claims were barred by the statute of limitations
 
 
 [3]
 Plaintiffs incorrectly refer to the Transportation Unlimited grievances as having never reached a final decision. Those grievances (Nos. 84-95; 84-96 & 84-97; see Joint Appendix at 26) were denied at step 3. See Joint Appendix at 86-87
 
 
 [4]
 Contrary to defendants' assertion, we do not read the December preferential hiring grievances (based on Article 5.4) as cumulative to the June subcontracting grievances (based on Article 25.1). Accordingly, this case does not fall within the proposition advanced by defendants (relying on McCreedy v. Local Union No. 971, 809 F.2d 1232 (6th Cir. 1987)), that the filing of a grievance within the statutory period will not result in a timely complaint where the grievance is cumulative to an earlier grievance finally decided prior to the start of the statutory period
 
 
 [5]
 We reject defendants' assertion that all of plaintiffs' claims are time-barred because plaintiffs knew or should have known of the accrual of their cause of action (1) upon the announcement of the plant closing in the summer of 1984, or (2) on the date of the initial layoffs, or (3) upon the layoff of the last employee in November of 1984. These events do not date the accrual of the cause of action because a hybrid 301 action does not arise until plaintiffs first exhaust their grievance remedies. See McCreedy v. Local Union No. 971, 809 F.2d 1232, 1236-37 (6th Cir. 1987) (cause of action accrued on the date the union's right to appeal an unsettled grievance expired); see also Hill v. Georgia Power Co., 786 F.2d 1071, 1074-75 (11th Cir. 1986)
 
 
 [6]
 Section 5.4 of the Agreement provides in pertinent part:
 The parties recognize that from time to time the needs of the business may require changes in operations, opening of facilities, closing of facilities, or transfers of certain operations. When an operation is transferred, jobs at the new location which become available within one (1) year (or to the extended time as mutually agreed to) after the transfer will first be offered to such displaced employees based on seniority.
 Joint Appendix at 34.
 
 
 [7]
 See Joint Appendix at 26-27 (Affidavit of Art Majewski; 'On or about October 13, 1984, a class grievance (No. 84-185) was filed to follow certain bakery work, including four bread deliveries and the work of two yard men.'); Joint Appendix at 89 (Grievance No. 84-185); Joint Appendix at 121 (Affidavit of Carl McCord)
 
 
 [8]
 Justice Brennan's dissent was not based on any dispute with the majority as to the proper standards for considering a Rule 56 motion. Rather, Justice Brennan disagreed with the majority's 'application of these principles to the facts of [the] case.' 106 S. Ct. at 2559 (Brennan, J., dissenting)
 
 
 [9]
 In light of our disposition of the issues, we find it unnecessary to address the question of whether the district court erred in granting the motions for summary judgment in view of plaintiffs' assertion that adequate discovery had been denied. See Fed. R. Civ. P. 56(f). Because plaintiffs' claims arising out of the June, 1984, grievances are time-barred, additional discovery would not have benefited plaintiffs. Because we have reversed the grant of summary judgment as to plaintiffs' claims arising out of the December, 1984, grievances, there is no reason to discuss the discovery issue as to those claims. On remand, however, we direct that discovery be reopened as to these claims
 We also decline to address defendants' assertion that the acceptance by some plaintiffs of severance pay operated to waive their rights under the contract, an argument not passed on by the district court. We believe it best for the district court to dispose of this issue in the first instance.